**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES W. SCHOTTEL, SHARON A. SCHOTTEL, and JUDITH A. BRUYERE, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 4:24-CV-1284 |
| WISCONSIN PHYSICIANS SERVICE INSURANCE CORPORATION and PROGRESS SOFTWARE CORPORATION, | ) ) ) ) ) | **CLASS ACTION COMPLAINT** **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

<u>**PLAINTIFFS' CLASS ACTION COMPLAINT**</u>

COMES NOW Plaintiffs James W. Schottel, Sharon A. Schottel and Judith A. Bruyere, et al., individually and on behalf of all others similarly situated (collectively the "Plaintiffs), by and through their attorneys, and for their Class Action Complaint against Defendant Wisconsin Physicians Service Insurance Corporation (hereinafter "Defendant WPS") and Defendant Progress Software Corporation (hereinafter "Defendant PSC") (collectively the "Defendants") and complain and allege upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys and respectfully states to this Honorable Court the following:

## I.    NATURE OF THE ACTION

### <u>Background Facts</u>

### Medicare

1.    This is a civil class action brought individually by Plaintiffs on behalf of Medicare recipients, who were Medicare recipients from May of 2023 to current.

2.      Medicare is a federal health insurance program in the United States for people age 65 or older and younger people with disabilities, including those with end stage renal disease and amyotrophic lateral sclerosis (ALS or Lou Gehrig's disease). Medicare was begun in 1965 under the Social Security Administration and is now administered by the Centers for Medicare and Medicaid Services ("CMS").

3.      Medicare is divided into four Parts: A, B, C and D. Part A covers hospital, skilled nursing, and hospice services. Part B covers outpatient services. Part D covers self-administered prescription drugs. Part C is an alternative that allows patients to choose private plans with different benefit structures that provide the same services as Parts A and B, usually with additional benefits:

(a)      Part A covers hospital (inpatient, formally admitted only), skilled nursing (only after being formally admitted to a hospital for three days and not for custodial care), home health care, and hospice services;

(b)      Part B covers outpatient services, including some providers' services while inpatient at a hospital, outpatient hospital charges, most provider office visits, durable medical equipment, and most professionally administered prescription drugs;

(c)      Part C is an alternative often called Managed Medicare by the Trustees (and almost all of which are deemed Medicare Advantage plans), which allows patients to choose health plans with at least the same service coverage as Parts A and B (and most often more), often the benefits of Part D; Part C's key differences with Parts A and B are that Part C plans include an annual out-of-pocket expense limit in an amount between $1500 and $8000 and do not have lifetime coverage limits;

(d)      Part D covers self-administered prescription drugs.

2

4.      In 2022, Medicare provided health insurance for 65.0 million individuals; more than 57 million people aged 65 and older and about 8 million younger people.

5.      Medicare has been operating for almost 60 years and, during that time, has undergone several major changes. Since 1965, the program's provisions have expanded to include benefits for speech, physical, and chiropractic therapy in 1972. Medicare added the option of payments to health maintenance organizations (HMOs) in the 1970s. The government added hospice benefits to aid elderly people on a temporary basis in 1982, and made this permanent in 1984.

6.      In April 2018, CMS began mailing out new Medicare cards with new ID numbers to all beneficiaries. Previous cards had ID numbers containing beneficiaries' Social Security numbers; the new ID numbers are randomly generated and not tied to any other personally identifying information.

7.      In 2022, **63.8 million people** were enrolled in Medicare programs. One in five Americans receives Medicare benefits.

8.      As of 2023, **65,636,490 Americans** are enrolled in Medicare. 1 This means roughly 25.4% of all 258.3 million U.S. adults are enrolled in Medicare.

**Wisconsin Physicians Service Insurance Corporation**

9.      Wisconsin Physicians Service Insurance Corporation is a not-for-profit service insurance corporation based in Madison, Wisconsin. WPS offers health insurance plans for groups and individuals and benefit plan administration for businesses. WPS also provides insurance claims processing services under various U.S. government contracts and has a subsidiary corporation, EPIC Specialty Benefits, offering dental and other nonmedical benefits.

10.     WPS relocated from Milwaukee to Madison in 1950. WPS expanded across the state over the next decade, opening sales offices in Kenosha, Green Bay, Eau Claire, Milwaukee, and Wausau. Later, offices were opened in Appleton and La Crosse. WPS moved its Madison headquarters to 1717 W. Broadway in November 1973. In 1998, WPS consolidated its three major lines of business—Medicare, TRICARE, and WPS Health Insurance—on its Monona campus.

11.     In 1975, the Wisconsin legislature passed a law requiring that service insurance corporations be legally separate from the parent professional society. In order to comply with the legislation, on April 27, 1977, WPS ended its relationship with the Wisconsin Medical Society, becoming an independent not-for-profit corporation.

12.     In 1966, the year *Medicare* was established, WPS was named the *Medicare* administrator for the state of Wisconsin. WPS is currently the Medicare Administrative Contractor for Jurisdiction 5 in Iowa, Kansas, Missouri, and Nebraska, as well as for Jurisdiction 8 in Indiana and Michigan.

**Progress Software Corporation**

13.     Progress Software Corporation is an American public company that produces software for creating and deploying business applications. Founded in Burlington, Massachusetts with offices in 16 countries, the company posted revenues of $531.3 million (USD) in 2021 and employs approximately 2100 people.

14.     In 2019, PSC acquired Ipswitch, Inc., an IT management vendor known for its **MOVEit®[1]** managed file transfer platform. (*emphasis added*).

15.     PSC's current products:

- Sitefinity – web content management.

---

[1] As set forth further and more fully described herein, MOVEit® is the program that caused the releases of confidential and Private Information of Medicare recipients.

- Sitefinity Digital Experience Cloud – customer experience tool for customer journey analysis, personalization, and optimization.

- NativeChat – an AI platform for creating and deploying chatbots.

- Corticon – business rules engine.

- Kemp LoadMaster

- Flowmon

- WhatsUp Gold

- Chef

- Kendo UI – UI toolkit for web development.

- Telerik – UI tools for .NET development.

- Test Studio – test automation.

- Fiddler Everywhere

- DataDirect Connectors – connectors to integrate data across relational, big data and cloud databases.

- DataDirect Hybrid Data Pipeline – hybrid connectivity to data in the cloud or on-premises.

- **MOVEit®**

- WS_FTP

- OpenEdge – platform for building business applications and database management system.

- MarkLogic

(*emphasis added*).

### Prior Data Breaches

16.    In 2023, a security vulnerability in Progress-owned file transfer software **MOVEit®** was exploited in a data breach affecting various companies and government

organizations. A running total maintained by cybersecurity company Emsisoft showed that more than 2,500 organizations were known to have been impacted as of October 25, 2023 with more than 80 percent of those organizations being US-based. The cybercriminal organization Clop was alleged to have been partially responsible for the attacks, and claimed responsibility for breaches of 1st Source, the BBC, British Airways, the New York City Department of Education, Putnam Investments, and Shell among others. (*emphasis added*).

17.     In 2023, the U.S. Securities and Exchange Commission ("SEC") opened an investigation into the MOVEit® mass-hack that has exposed the personal data of at least 64 million people.[2]

### Connection Between Medicare, WPS and PSC

18.     WPS is a CMS contractor that handles certain Medicare claims in the State of Missouri and possibly other states.

19.     The **MOVEit®** software is a third-party application used by WPS for the transfer of files during the Medicare claims process. (*emphasis added*).

20.     WPS is among the many organizations in the United States that have been impacted by the **MOVEit®** vulnerability. (*emphasis added*).

### II.     PARTIES

21.     Plaintiff James W. Schottel is a resident and citizen of the County of St. Louis, Missouri.

22.     Plaintiff Sharon A. Schottel is a resident and citizen of the County of St. Louis, Missouri.

---

[2] Carly Page, *SEC is investigating MOVEit mass-hack, says Progress Software*, https://techcrunch.com/2023/10/11/sec-is-investigating-moveit-mass-hack-says-progress-software/ (October 11, 2023) (last visited Sep. 22, 2024).

23.     Plaintiff Judith A. Bruyere is a resident and citizen of the County of St. Louis, Missouri.

24.     Defendant Wisconsin Physicians Service Insurance Corporation is a not-for-profit service insurance corporation with its principal place of business at 1717 W Broadway Madison, WI 53713.

25.     Defendant Progress Software Corporation is a Massachusetts corporation with its principal place of business at 15 Wayside Rd, Suite 400, Burlington, MA 01803.

### III.     JURISDICTION AND VENUE

26.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class and multiple state classes, filed under Rule 23 of the Federal Rules of Civil Procedure; there are likely approximately 1 million Class members.[3]

27.     The amount in controversy in this class action exceeds $5,000,000, exclusive of interest and costs and there are numerous Class members who are citizens of states other than the Defendants' states of citizenship.

28.     This Court also has subject-matter jurisdiction over Plaintiffs' and Class members' claims pursuant to 28 U.S.C. § 1367(a).

29.     This Court has personal jurisdiction over Defendant WPS in this matter because the acts and omissions giving rise to this action occurred in the State of Missouri.

---

[3] Kurt Knutsson, *Nearly 1 million Medicare beneficiaries face data breach*, https://www.msn.com/en-us/money/other/nearly-1-million-medicare-beneficiaries-face-data-breach/ar-AA1qonZn#:~:text=The%20Centers%20for%20Medicare%20%26%20Medicaid%20Services%20%28CMS%29,Wisconsin%20Physicians%20Service%20Insurance%20Corp.%2C%20a%20CMS%20contractor) (last visited Sep. 20, 2024).

30.     This Court has personal jurisdiction over Defendant PSC in this matter because the acts and omissions giving rise to this action occurred in the State of Missouri.

31.     Venue is proper in this Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b)(2) and (c) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this Eastern District of Missouri and because the Defendants transact business and/or has agents within this Eastern District of Missouri and has intentionally availed itself to the laws and markets within this Eastern District of Missouri.

## IV.    FACTS

32.     Class members received a letter dated September 6, 2024 from CMS informing the following:

### 1st Breach

(a)     On July 8, 2024, WPS notified CMS that files containing protected health information, such as Medicare claims data, and related personally identifiable information (collectively, "Personal Information") was compromised in a cybersecurity incident involving **MOVEit®**. (*emphasis added*);

(b)     A vulnerability in the **MOVEit®** software made it possible, between May 27 through 31, 2023, for unauthorized third parties to gain access to Personal Information that was transferred using **MOVEit®**; (*emphasis added*);

(c)     Progress Software (PSC), the developer of **MOVEit®**, discovered and disclosed the vulnerability in the **MOVEit®** software to the public on May 31, 2023; (*emphasis added*);

(d)    Progress Software (PSC) released a software patch to fix the vulnerability. WPS applied the patch and investigated the potential impact of the vulnerability on its systems. However, in the 2023 investigation, WPS did not observe any evidence that an unauthorized party obtained copies of files that were within the WPS **MOVEit®** application. (*emphasis added*). (*See* Plaintiff's Exhibit 1 *attached hereto*).[4]

### Additional Breach

33.    In May 2024, acting on new information, WPS conducted an additional review of its **MOVEit®** file transfer system with the assistance of a third-party cybersecurity firm. WPS confirmed that it had successfully patched the **MOVEit®** vulnerability in early June 2023, after which there was no evidence of further activity by an unauthorized third party. (*emphasis added*).

34.    However, the review also indicated that, before PSC released the patch, an unauthorized third party copied files from WPS's **MOVEit®** file transfer system. (*emphasis added*).

35.    In coordination with law enforcement, WPS evaluated some of those impacted files. That portion of impacted files did not contain any Personal Information.

36.    On July 8, 2024, when evaluating a different portion of the impacted files, WPS determined that some of the files contained Personal Information, at which point it informed CMS.

37.    In a letter dated September 6, 2024 from CMS to Plaintiffs and other Class members, Plaintiffs and other Class members were informed:

> "We have determined that your Personal Information was present in certain files involved-in this incident. This information may have included the following:
>
> - Name
> - Social Security Number or Individual Taxpayer Identification Number

---

[4] *See e.g.* Plaintiffs' Exhibit 1 was sent to Plaintiffs' counsel, James W. Schottel, Jr, a Medicare beneficiary and potential Class member, and identical to letters that were received by all Plaintiffs regarding the data breach of their Personal Information.

- Date of Birth
- Mailing Address
- Gender
- Hospital Account Number
- Dates of Service
- Medicare Beneficiary Identifier (MBI) and/or Health Insurance Claim Number."

(*See* Plaintiffs' Exhibit 1 *attached hereto*).

38.    Herein, Plaintiffs, individually and on behalf of the members of the Class seek to represent, bring this action against Defendant Wisconsin Physicians Service Insurance Corporation and Defendant Progress Software Corporation.

39.    Plaintiffs assert claims for themself and on behalf of a nationwide Class of Medicare recipients for Defendants' negligence, negligence per se, and unjust enrichment, for themself and on behalf of the Class, for Defendants' violation of privacy laws.

40.    Plaintiffs seek monetary damages, declaratory and injunctive relief, and other remedies for violations of federal and state statutes and the common law.

**A.    Defendants Had Notice of Data Breaches, Particularly Involving the MOVEit® Software.**

41.    Defendants were well aware that the file transfer software MOVEit® was vulnerable to data breaches as evidenced by the 2023 data breach detailed in Paragraph 16, *supra*.

42.    Defendants were also well aware of the likelihood and repercussions of cyber security threats, including data breaches, having observed numerous other well-publicized data breaches involving major corporations over the last few years alone—including Equifax and Facebook—as well as the numerous other similar data breaches preceding those blockbuster breaches.

43.    In September 2015, credit reporting agency Experian acknowledged that an unauthorized party accessed one of its servers containing the names, addresses, dates of birth,

driver's license, and additional Personal Information of more than 15 million consumers over a period of two years.

### B.    Defendants Failed to Comply with Industry Standards.

44.    Following the Equifax data breach, Senator Elizabeth Warren commissioned an investigation and, in February 2018, Senator Warren's office released the results of the 5-month investigation, setting forth a number of findings regarding Equifax's data breach, including the inadequate data security practices that contributed to the data breach (hereinafter the "Warren Report").[5]

45.    Senator Warren's investigation revealed that the Equifax data breach was made possible because Equifax adopted weak cyber security measures that failed to protect consumer data and information falling within the Personal Information at issue in this Class Action. (Warren Report, at 3).

46.    Senator Warren consulted with industry experts, and the Warren Report concluded that companies that hold large amounts of sensitive data—including Personal Information at issue here—should have multiple layers of cyber security, including: (a) frequently updated tools to prevent hackers from breaching their systems; (b) controls that limit hackers' ability to move throughout their systems in the event of an initial breach; (c) restrictions on hackers' ability to access sensitive data in the event of an initial breach; and (d) procedures to monitor and log all unauthorized access in order to stop the intrusion as quickly as possible. Id.

---

[5] The Office of Senator Elizabeth Warren, *Bad Credit: Uncovering Equifax's Failure to Protect Americans' Personal Information*, (February 2018), https://www.warren.senate.gov/files/documents/2018_2_7_%20Equifax_Report.pdf (last visited Sep. 20, 2024).

47.    Much like the Defendants here, Senator Warren warned that "Despite collecting data on hundreds of millions of Americans without their permission, Equifax failed to fully and effectively adopt any of these four security measures." Id.

48.    Despite these well-publicized data breaches, a Senate report and other expert reports, Defendants failed to heed the recommendations, and inexplicably transferred sensitive files—and the Personal Information which rested thereon—in a vulnerable manner and available to even the most basic cyber-attack.

**C.    The Defendants Data Breach Caused Harm and Will Result in Additional Fraud.**

49.    Without detailed disclosure to the nearly 1 million, or more, affected people, including Plaintiffs and the Class members, these people have been left exposed, unknowingly and unwittingly, for months to continued misuse and ongoing risk of misuse of their Personal Information without being able to take necessary precautions to prevent imminent harm.

50.    Plaintiffs have and will incur costs associated with purchasing credit monitoring services.

51.    The ramifications of Defendants' failures to keep Plaintiffs' and the Class members' Personal Information secure are severe.

52.    The Federal Trade Commission (hereinafter the "FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[6]

53.    The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person." Id.

---

[6] 17 C.F.R § 248.201 (2013).

12

54.     Identity thieves can use Personal Information, such as that of Plaintiffs' and the other Class members', which Defendants failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's Personal Information to obtain government benefits; or filing a fraudulent tax return using the victim's Personal Information to obtain a fraudulent refund.

55.     According to the Identity Theft Resource Center® (ITRC), a nationally recognized nonprofit organization established to support victims of identity crime; in 2023, the ITRC tracked 3,205 data compromises in 2023, 1,404 more than in 2022; an increase of 78%.[7]

56.     There may be a time lag between when harm occurs versus when it is discovered, and also between when Personal Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which previously conducted a study regarding data breaches:

> "[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."

*See* GAO, *Report to Congressional Requesters*, p. 29 (June 2007), http://www.gao.gov/new.items/d07737.pdf (last visited Sep. 20, 2024).

57.     Thus, Plaintiffs and the other Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class are

---

[7] Identity Theft Resource Center, *Identity Theft Resource Center 2023 Annual Data Breach Report Reveals Record Number of Compromises; 72 Percent Increase Over Previous High*, (Jan. 25, 2024), https://www.idtheftcenter.org/post/2023-annual-data-breach-report-reveals-record-number-of-compromises-72-percent-increase-over-previous-high/ (last visited Sep. 20, 2024).

incurring and will continue to incur such damages in addition to any fraudulent opening of credit cards in their name, any charges incurred in their name and the resulting loss of said fraudulent action, whether or not such charges are ultimately reimbursed by the credit card companies.

58.    Further, hackers who obtain a person's Personal Information, can send very authentic-looking emails to persons containing links within the mail that, when clicked will infect the person's computer with malware (often referred to as "phishing emails." A person with a computer infected with malware will lose the use of the computer and cost the person several hundred dollars in computer repair.

### D.    Plaintiffs and the other Class Members Suffered Damages

59.    Plaintiffs' and the other Class members' Personal Information is private and sensitive in nature, and was left inadequately protected, if not completely unprotected, by Defendants. Defendants did not obtain Plaintiffs' or the other Class members' consent to disclose their Personal Information to any other person or entity, as required by applicable law and industry standards.

60.    The data breach was a direct and proximate result of Defendants' failure to properly safeguard and protect Plaintiffs' and the other Class members' Personal Information from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including Defendants' failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and the other Class members' Personal Information to protect against reasonably foreseeable threats to the security or integrity of such information.

61.    Defendants had the resources to prevent a breach. Defendants made significant expenditures to market its products and touted its data security as industry leading, but neglected

to adequately invest in data security, despite the growing number of Personal Information exfiltrations, as well as several years of well-publicized data breaches.

62.     Had Defendants remedied the deficiencies in its database and computer systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendants would not have used the MOVEit® software to transfer files containing the Personal Information of Plaintiffs and the other Class members, and instead would have prevented the dissemination of Personal Information of approximately 1 million Medicare beneficiaries, or more.

63.     As a direct and proximate result of Defendants' wrongful actions and inaction and the resulting data breach, Plaintiffs and the other Class members have been placed in an imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and effort to mitigate the actual and potential impact of the data breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, changing the information used to verify their identity to information not subject to this data breach, and potentially filing police reports. This time has been lost forever and cannot be recaptured.

64.     The injuries suffered by Plaintiffs and the Class as a direct result of the data breach include, but are not limited to:

       (a)     theft of their Personal Information;

       (b)     the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the data breach, including ascertainable costs for purchasing credit

monitoring services and identity theft protection services and the stress, nuisance and annoyance of dealing with all such issues resulting from the data breach;

(c)     the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Personal Information being placed in the hands of criminals and already misused via the sale of Plaintiffs' and Class members' Personal Information on the Internet black market;

(d)     being subjected to having malware infect their computer from opening an email appearing to be an authentic email prepared and sent by a hacker using the compromised Personal Information, costs in repairing a malware-infected computer and costs in purchasing additional computer malware protection;

(e)     the untimely and inadequate notification of the data breach;

(f)     the improper disclosure of their personal data;

(g)     loss of privacy;

(h)     ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the data breach;

(i)     ascertainable losses in the form of deprivation of the value of their Personal Information, for which there is a well-established national and international market; and

(j)     the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of

16

the data breach, purchasing credit monitoring and identity theft protection services and the stress, nuisance and annoyance of dealing with all such issues resulting from the data breach.

65.     Although the Personal Information of Plaintiffs and the other Class Members has been stolen, Defendants continue to hold Personal Information of approximately 1 million people, or more, including Plaintiffs' and the other Class members' Personal Information. Particularly, because Defendants have demonstrated an inability to prevent a data breach or stop it from continuing—even after being detected and informed of the impermissible dissemination—Plaintiffs and the other Class Members have an undeniable interest in ensuring their Personal Information is secure, remains secure, is properly and promptly destroyed, and is not subject to further disclosure and theft.

## V.    CLASS ALLEGATIONS

66.     Pursuant to Rules 23(b)(1), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure, Plaintiffs assert that common law claims against the Defendants for negligence, negligence per se, bailment, and unjust enrichment, declaratory and injunctive relief, and the various consumer protection laws, on behalf of themselves and the following class (the "Class"):

**NATIONWIDE CLASS:**

All residents of the United States whose Personal Information was compromised as a result of the data breach.

67.     Pursuant to Rules 23(b)(1), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure, Plaintiffs assert statutory claims under state data breach statutes, on behalf of separate statewide subclasses:

**STATEWIDE SUBCLASS:**

All residents of the United States of America whose Personal Information was compromised as a result of the data breach.

68.    Excluded from the foregoing Class and Subclass are Defendants, any entity in which Defendants has a controlling interest, and Defendants' organizers, officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the nationwide class and subclass is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

**Numerosity: Rule 23(a)(1) of the Federal Rules of Civil Procedure**

69.    The members of the Class and Subclass are so numerous and geographically dispersed that individual joinder of all Class and Subclass members is impracticable. Plaintiffs are informed and believe—based on the size of the exposed database—that there are approximately 1 million Class members or more. Those individuals' names and addresses are available from Defendants' records, and Class and Subclass members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

**Commonality and Predominance:**
**Rules 23(a)(2) and 23(b)(3) of the Federal Rules of Civil Procedure**

70.    This action involves common questions of law and fact, which predominate over any questions affecting individual class members, including, without limitation:

(a)    Whether Defendants knew or should have known that its file-transfer software MOVEit® was susceptible to date breaches and the Personal Information stored and transferred therein;

(b)   Whether Defendants knew or should have known that the files transferred containing Plaintiffs' and Class members' Personal Information stored therein, was properly encrypted or unencrypted;

(c)   Whether Defendants failed to take adequate and reasonable measures to ensure files transferred containing Plaintiffs' and Class members' Personal Information were protected;

(d)   Whether Defendants failed to take available steps to prevent and stop the data breach from occurring;

(e)   Whether Defendants failed to disclose the material facts that they did not have adequate security practices to safeguard Plaintiffs' and Class members' Personal Information;

(f)   Whether Defendants failed to provide timely and adequate notice of the data breach;

(g)   Whether Defendants owed a duty to Plaintiffs and other Class members to protect their Personal Information and to provide timely and accurate notice of the data breach to Plaintiffs and other Class members;

(h)   Whether Defendants breached its duties to protect the Personal Information of Plaintiffs and other Class members by failing to provide adequate data security and by failing to provide timely and accurate notice to Plaintiffs and other Class members of the data breach;

(i)   Whether Defendants' conduct, including its failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the

unauthorized access and/or theft of approximately 1 million, or more, Medicare recipients' Personal Information;

(j)     Whether Defendants' conduct renders them liable for negligence, negligence per se, and unjust enrichment;

(k)     Whether, as a result of Defendants' conduct, Plaintiffs and other Class members face a significant threat of harm and/or have already suffered harm, and, if so, the appropriate measure of damages to which they are entitled; and

(l)     Whether, as a result of Defendants' conduct, Plaintiffs and other Class members are entitled to injunctive, equitable, declaratory, and/or other relief, and, if so, the nature of such relief.

### Typicality: Rule 23(a)(3) of the Federal Rules of Civil Procedure

71.     Plaintiffs' claims are typical of the other Class and Subclass members' claims because Plaintiffs and the other Class and Subclass members were subjected to the same allegedly unlawful conduct and damaged in the same way.

### Adequacy of Representation: Rule 23(a)(4) of the Federal Rules of Civil Procedure

72.     Plaintiffs are adequate class representatives because their interests do not conflict with the interests of the other Class members and Subclass members who they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

73.     The Class' interests and Subclass' interests will be fairly and adequately protected by Plaintiffs and their counsel.

20

**Declaratory and Injunctive Relief: Rule 23(b)(2) of the Federal Rules of Civil Procedure**

74.    The prosecution of separate actions by individual Class and Subclass members would create a risk of inconsistent or varying adjudications with respect to individual Class and Subclass members that would establish incompatible standards of conduct for Defendants.

75.    Such individual actions would create a risk of adjudications, which would be dispositive of the interests of other Class and Subclass members and impair their interests.

76.    Defendants have acted and/or refused to act on grounds generally applicable to the Class and Subclass, making final injunctive relief or corresponding declaratory relief appropriate.

**Superiority: Rule 23(b)(3) of the Federal Rule of Civil Procedure**

77.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action.

78.    The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct.

79.    Even if Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.   CLAIMS ALLEGED ON BEHALF OF THE CLASS

### COUNT I

### <u>NEGLIGENCE</u>
### <u>AGAINST DEFENDANT WISCONSIN PHYSICIANS SERVICE</u>
### <u>INSURANCE CORPORATION AND</u>
### <u>DEFENDANT PROGRESS SOFTWARE CORPORATION</u>
**(Asserted by Plaintiffs, individually, and on behalf of the Class, and, in the alternative, Statewide Subclass)**

80.     Plaintiffs re-allege all of the preceding paragraphs as if set forth fully herein.

81.     Defendants owed a duty to Plaintiffs and the other Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, handling, transferring and protecting their Personal Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

82.     This duty included, among other things, designing, maintaining, transferring and testing Defendants' electronic and security systems to ensure that Plaintiffs' and the other Class and Subclass members' Personal Information in Defendants' possession was adequately secured and protected.

83.     Defendants further owed a duty to Plaintiffs and the other Class and Subclass members to implement processes that would detect a breach of its electronic and security systems in a timely manner, particularly its electronic transfer system, and to timely act upon warnings and alerts, including those generated by its own electronic and security systems.

84.     Defendants owed a duty to Plaintiffs and the other Class and Subclass members to provide security, including consistent with industry standards and requirements, to ensure that its file-transfer system, computer systems and computer networks, and the personnel responsible for

them, adequately protected the Personal Information of Plaintiffs and the other Class and Subclass members about whom Defendants collected, maintained, and used such information.

85.    Defendants owed a duty of care to Plaintiffs and the other Class and Subclass members because, as Medicare beneficiaries, they were foreseeable and probable victims of any inadequate security practices.

86.    Defendants solicited Medicare, gathered, and stored the Personal Information provided by Plaintiffs and the other Class and Subclass members to facilitate its products to customers.

87.    Defendants knew it inadequately transferred electronic files containing Personal Information of Plaintiffs and the other Class and Subclass members and knew or should have known that such information was susceptible to a data breach and not subject to any reasonable data security measures.

88.    Defendants' duty to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair…practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect Personal Information by companies such as Defendants.

89.    Various FTC publications and data security breach orders further form the basis of Defendants' duty; additionally, individual states have enacted statutes based upon the FTC Act that also create a duty.

90.    Defendants knew that a breach of its systems would cause damages to Plaintiffs and the other Class and Subclass members and Defendants had a duty to adequately protect such sensitive Personal Information.

91.     Defendants owed a duty to timely and accurately disclose to Plaintiffs and the other Class and Subclass members that their Personal Information had been or was reasonably believed to have been compromised.

92.     Timely disclosure was required, appropriate, and necessary so that, among other things, Plaintiffs and the other Class and Subclass members could take appropriate measures to change the information used to verify their identity to information not subject to this data breach, monitor their account information and credit reports for fraudulent activity, contact their banks or other financial institutions that issue their credit or debit cards, obtain credit monitoring services and take other steps to mitigate or ameliorate the damages caused by Defendants' misconduct.

93.     Defendants knew, or should have known, of the risks inherent in collecting, storing and transferring the Personal Information of Plaintiffs and the other Class and Subclass members and of the critical importance of providing adequate security of that information.

94.     Defendants' own conduct also created a foreseeable risk of harm to Plaintiffs and the other Class and Subclass members; Defendants' misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent and stop the data breach as set forth herein and also includes their decisions not to comply with industry standards for the safekeeping and maintenance of the Personal Information of Plaintiffs and the other Class and Subclass members.

95.     Defendants breached the duties it owed to Plaintiffs and the other Class and Subclass members by failing to exercise reasonable care and implementing adequate security systems, protocols, and practices sufficient to protect the Personal Information of Plaintiffs and the other Class and Subclass members.

96.     Defendants breached the duties it owed to Plaintiffs and the other Class and Subclass members by failing to properly implement technical systems or security practices that could have prevented the dissemination and loss of the Personal Information at issue.

97.     Defendants breached the duties it owed to Plaintiffs and the other Class and Subclass members by failing to properly maintain their sensitive Personal Information. Given the risk involved and the amount of data at issue, Defendants' breach of its duties was entirely unreasonable.

98.     Defendants breached its duties to timely and accurately disclose that Plaintiffs' and the other Class and Subclass members' Personal Information in Defendants' possession had been or was reasonably believed to have been, stolen or compromised.

99.     But for Defendants' wrongful and negligent breach of its duties owed to Plaintiffs and the other Class and Subclass members, their Personal Information would not have been compromised.

100.    The injuries and harm suffered by Plaintiffs and the other Class and Subclass members, as set forth above, was the reasonably foreseeable result of Defendants' failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and the other Class and Subclass members' Personal Information within Defendants' possession. Defendants knew or should have known that its systems and technologies for processing, securing, safeguarding, transferring electronic files and deleting Plaintiffs' and the other Class and Subclass members' Personal Information were inadequate and vulnerable to being breached by hackers.

101.    Plaintiffs and the other Class and Subclass members suffered injuries and losses described herein as a direct and proximate result of Defendants' conduct resulting in the data breach, including Defendants' lack of adequate reasonable and industry standard security

measures. Had Defendants implemented such adequate and reasonable security measures, Plaintiffs and the other Class and Subclass members would not have suffered the injuries alleged, as the data breach would likely have not occurred.

102.    As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and the other Class and Subclass members have suffered injury and the significant risk of harm in the future and are entitled to damages in an amount to be proven at trial.

**COUNT II**

**NEGLIGENCE PER SE**
**AGAINST DEFENDANT WISCONSIN PHYSICIANS SERVICE**
**INSURANCE CORPORATION AND**
**DEFENDANT PROGRESS SOFTWARE CORPORATION**
**(Asserted by Plaintiffs, individually, and on behalf of the Class, and, in the alternative, Statewide Subclass)**

103.    Plaintiffs re-allege all of the preceding paragraphs as if set forth fully herein.

104.    Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair…practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies—such as Defendants—of failing to use reasonable measures to protect Personal Information. Various FTC publications and orders also form the basis of Defendants' duty.

105.    Defendants violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Personal Information and not complying with industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of Personal Information it obtained and stored and the foreseeable consequences of a data breach.

106.    Defendants' violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence per se.

107.    The Class and the alternative state specific subclass are within the class of persons Section 5 of the FTC Act (and similar state statutes) was intended to protect, as they are engaged in trade and commerce, and Defendants bear primary responsibility for reimbursing consumers for fraud losses. Plaintiffs and absent class members are consumers.

108.    Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs, the Class, and the alternative state specific class members.

109.    Defendants' wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiffs', the other Class members' and the Subclass members' Personal Information, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including, but not limited to:

(a)    theft of their Personal Information;

(b)    the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the data breach, including ascertainable costs for purchasing credit monitoring services and identity theft protection services and the stress, nuisance and annoyance of dealing with all such issues resulting from the data breach;

(c)    the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Personal Information being placed in the

hands of criminals and already misused via the sale of Plaintiffs' and Class members' Personal Information on the Internet black market;

(d)     being subjected to having malware infect their computer from opening an email appearing to be an authentic email prepared and sent by a hacker using the compromised Personal Information, costs in repairing a malware-infected computer and costs in purchasing additional computer malware protection;

(e)     the untimely and inadequate notification of the data breach;

(f)     the improper disclosure of their personal data;

(g)     loss of privacy;

(h)     ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the data breach;

(i)     ascertainable losses in the form of deprivation of the value of their Personal Information, for which there is a well-established national and international market; and

(j)     the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the data breach, purchasing credit monitoring and identity theft protection services and the stress, nuisance and annoyance of dealing with all such issues resulting from the data breach.

110.    Although the Personal Information of Plaintiffs, the other Class members, and the Subclass members has been stolen, Defendants continue to hold Personal Information of over 65

million people, including Plaintiffs', the other Class members' and the Subclass members' Personal Information.

111.    Particularly, because Defendants have demonstrated, more than once, an inability to prevent a data breach or stop it from continuing—even after being detected and informed of the impermissible dissemination—Plaintiffs, the other Class members, and Subclass members have an undeniable interest in ensuring their Personal Information is secure, remains secure, is properly and promptly destroyed when appropriate and is not subject to further disclosure and theft.

**COUNT III**

**UNJUST ENRICHMENT**
**AGAINST DEFENDANT WISCONSIN PHYSICIANS SERVICE**
**INSURANCE CORPORATION AND**
**DEFENDANT PROGRESS SOFTWARE CORPORATION**
**(Asserted by Plaintiffs, individually, and on behalf of the Class, and, in the alternative, Statewide Subclass)**

112.    Plaintiffs re-allege all of the preceding paragraphs as if set forth fully herein.

113.    Defendants collected, maintained, and permitted Plaintiffs', the other Class and Subclass members' and others' Personal Information to be obtained by other persons without the knowledge or direct consent of Plaintiffs, the other Class members, the Subclass members and others.

114.    Defendants appreciates or has knowledge of the benefits conferred directly upon them by Plaintiffs, the other Class members, the Subclass members and others.

115.    As a result of Defendants' wrongful conduct, as alleged herein, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs, the other Class members, the Subclass members and others.

116.    Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiffs', the other Class

members', and Subclass members' sensitive Personal Information, while at the same time failing to maintain that information secure from intrusion and theft by hackers and identity thieves.

117.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendants to be permitted to retain the benefits it received, and is still receiving, without justification, from Plaintiffs, the other Class members, the Subclass members and others, in an unfair and unconscionable manner.

118.    Defendants' retention of such benefits under the circumstances making it inequitable to do so constitutes unjust enrichment.

119.    Plaintiffs, the other Class members, the Subclass members, and others did not confer these benefits officiously or gratuitously and it would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

**COUNT IV**

**DECLARATORY AND INJUNCTIVE RELIEF**
**AGAINST DEFENDANT WISCONSIN PHYSICIANS SERVICE**
**INSURANCE CORPORATION AND**
**DEFENDANT PROGRESS SOFTWARE CORPORATION**
**(Asserted by Plaintiffs, individually, and on behalf of the Class, and, in the
alternative, Statewide Subclass)**

120.    Plaintiffs re-allege all of the preceding paragraphs as if set forth fully herein.

121.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq., this Honorable Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, this Court has broad authority to restrain acts, such as here, which are tortious and which violate the terms of the federal and state statutes described in this Complaint.

122.    An actual controversy has arisen in the wake of the data breach regarding Defendants' common law, statutory, and other duties to reasonably safeguard Plaintiffs', the other

Class members', the Subclass members' and others' Personal Information and whether Defendants are currently maintaining data security measures adequate to protect Plaintiffs, the other Class members, the Subclass members and others from further data breaches that compromise their Personal Information.

123.    Plaintiffs allege that Defendants' data security measures were and remain inadequate.

124.    Furthermore, Plaintiffs continues to suffer injury as a result of the compromise of their Personal Information and remain at imminent risk that further compromises of his Personal Information will occur in the future.

125.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

(a)    Defendants owed and continue to owe a legal duty to secure Plaintiffs', the other Class members', the Subclass members', and others' Personal Information and to timely notify consumers of a data breach under the common law, Section 5 of the FTC Act, and various state statutes; and

(b)    Defendants continue to breach its legal duties by failing to employ reasonable measures to secure Plaintiffs', the other Class members', the Subclass members', and others' Personal Information.

126.    This Court should also issue corresponding injunctive relief requiring Defendants to employ adequate security protocols consistent with industry standards to protect Plaintiffs', the other Class members', the Subclass members' and others' Personal Information.

127.    If an injunction is not issued, Plaintiffs will suffer additional irreparable injury, and lack an adequate legal remedy, in the event of another data breach of Defendants' handling

electronic files containing Plaintiffs', the other Class members', the Subclass members' and others' Personal Information.

128.    The risk of another such data breach is real, immediate, and substantial.

129.    The hardship to Plaintiffs, if an injunction does not issue, exceeds the hardship to Defendants if an injunction is issued. Among other things, if another massive data breach occurs with Defendant WPS and Defendant PSC, Plaintiffs will likely be subjected to substantial identify theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable data security measures is relatively minimal, and Defendants have pre-existing legal obligations to employ such measures.

130.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach of Defendants' database, thus eliminating the additional injuries that would result to Plaintiff, the other Nationwide Class members, the Subclass members, and others whose Personal Information would be further compromised.

## **REQUEST FOR RELIEF**

WHEREFORE, for the foregoing reasons, Plaintiffs, individually and on behalf of the Class and Subclass members, respectfully request this Honorable Court to enter judgment in their favor and against Defendants, as follows:

1.    That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper class representatives; and appoint Plaintiffs' attorneys as Class Counsel;

2.    That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

3.      That the Court award Plaintiffs and the other Class and Subclass Members actual, direct (where actual and direct damages are separate under the law), compensatory, consequential, and general damages in an amount to be determined at trial;

4.      Declare that Defendant Wisconsin Physicians Service Insurance Corporation is financially responsible for notifying all Class members of the data breach and the release of the Class members' Personal Information;

5.      Declare that Defendant Progress Software Corporation is financially responsible for notifying all Class members of the data breach and the release of the Class members' Personal Information;

6.      That the Court Order that Defendants shall audit, for the past five (5) years and reassess all prior electronic file transfer of files of Medicare beneficiaries containing Personal Information, using the "MOVEit®" managed file transfer software;

7.      That the Court Order disgorgement and restitution of all earnings, profits, compensation, and benefits Defendants have received as a result of its unlawful acts, omissions, and practices;

8.      That the Court award statutory damages, and punitive or exemplary damages, to the extent permitted by law;

9.      That the unlawful acts alleged in this Complaint be adjudged and decreed to be negligent, negligent per se, and unjust enrichment;

10.     That Plaintiffs be granted the declaratory relief sought herein;

11.     That the Court award to Plaintiffs reasonable attorneys' fees, including expert witness fees, and award to Plaintiffs fees and expenses in the prosecution of this action;

12.    That the Court award pre-judgment and post-judgment interest at the maximum legal rate; and

13.    That the Court grant all such other relief as it deems just and proper under the circumstances.


DATED: <u>September 23, 2024</u>.

                                        Respectfully submitted,

                                        SCHOTTEL & ASSOCIATES, P.C.

                                        BY: s/*<u>James W. Schottel, Jr.</u>*
                                              James W. Schottel, Jr.    #51285MO
                                              906 Olive St., PH
                                              St. Louis, MO 63101
                                              (314) 421-0350
                                              (314) 421-4060 facsimile
                                              jwsj@schotteljustice.com

                                              Attorneys for Plaintiffs and the
                                              Proposed Class and Subclass
                                              James W. Schottel
                                              Sharon A. Schottel
                                              Judith A. Bruyere, et al.